# HARTNEY v. GOSLING, ET AL.

PARTNERSHIP — MINING PARTNERSHIPS. — IMPLIED AUTHORITY OF PARTNER TO CONTRACT DEBTS — ADVANCES TO PROSPECTOR — CONTRACT—EVIDENCE, ADMISSIBILITY—PLEADING, AND EVIDENCE THEREUNDER—VARIANCE.

1. In a strictly mining partnership one partner has no implied authority to borrow money on the credit of the firm.

2. The implied power of a partner in a mining partnership, as to third persons, does not extend beyond authority to bind his co-partners by dealings on credit for the purpose of working the mine, where it appears necessary or usual in the management and course of the business.

3. A mining partnership exists only where there is co-operation in developing or working a mine, and does not result from the mere fact that parties are tenants in common of mining property.

4. A mining partnership may be implied from the acts of the parties.

5. A party is not impliedly bound for expenses for personal supplies incurred by a prospector for mineral from the mere fact that he has provided him with a definite sum to use in prospecting, and is to receive in consideration thereof an interest in whatever may be discovered.

6. Where, in consideration of a proportionate interest in whatever might be discovered, several parties supplied another with a definite sum of money to prospect in Alaska for mineral, and agreed to furnish his family during his absence with a certain monthly allowance for their support, but there was no agreement for further advances. Held, that the parties were not impliedly liable as mining partners for a debt incurred by the prospector for money and provisions for his personal needs, it not appearing that the debt was incurred for the purpose of developing or working a mine in which the parties had co-operated.

7. Where, in consideration of a proportionate interest in whatever might be discovered, certain parties furnished another a definite sum of money to prospect for mineral, and agreed during his absence to supply his family with a certain monthly allowance toward their support, but there was no agreement for further advances. Held, that the contract did not bind the parties for a debt incurred by the prospector for personal supplies, either before or after the exhaustion of the sum advanced to him.

8. In a suit to recover upon such a debt it was not error to permit defendants to testify that they had not authorized the prospector to borrow money or contract debts on their individual behalf, or on behalf of the company or association, since, not being otherwise liable, it was admissible for them to show that they had not specially authorized the debt; and it was not permitting partners to testify as to agreements between themselves limiting their liability.

9. Although the parties were not liable on the original contract nor as mining partners for the debt sued on, it was error as against one of the defendants to exclude proof of a letter alleged in the offer to have been written by him authorizing the prospector to incur the debt, and stating that the company and himself would be responsible therefor, which letter was shown to plaintiff, who testified that he furnished the provisions on the strength of the letter; since such evidence was relevant and competent as tending to show that the writer of the letter had, as to plaintiff, held himself out as a partner of the prospector, and had, as such, authorized the debt.

10. No proof having been tendered that the other defendants assented to or knew of the letter, they would not have been affected by it, and hence, as against them, the exclusion of the letter was not error.

11. The exclusion of the letter was not rendered harmless from the fact that plaintiff had testified to its contents without objection; since it was evident from the exclusion of the same character of evidence when twice offered that the court, trying the case without a jury, regarded the matter as immaterial, and decided the cause without reference to the letter as bearing upon the writer's personal liability, and treated the testimony on the subject as though not in the case.

12. Should the effect of the letter be to establish a guaranty for a debt to be incurred rather than a holding out as partner, the opinion is expressed that it would constitute a failure of proof; since the suit is not based upon a guaranty, but upon liability as partners.

13. Where several persons are sued as partners, and part only prove to be liable, or to have authorized the contract, or are found to be partners, judgment may, under the statute (R. S., Sec. 3752), be rendered against them and for the others, whether the action be one on contract or in tort.

14. Although a petition charges the defendants with liability for the debt sued on as members of a partnership, evidence is admissible to show that a defendant by acts or admissions held himself out to the plaintiff as a partner of the one who incurred the debt, and so acting authorized the debt.

15.  Proof that a defendant held himself out as a partner and as
such authorized the debt sued on is not fatally variant from
an allegation in the petition that the defendants incurred the
debt as members of a partnership.

[Decided May 28, 1902.]

Error to the District Court, Sweetwater County, Hon.
David H. Craig, Judge.

The suit was brought by plaintiff in error to recover of
defendants a certain sum of money alleged to have been
loaned by him to them as a partnership.  The facts are
stated in the opinion.  Judgment was rendered for defen-
dants, and plaintiff brought the case here on error.

*John H. Chiles* and *T. S. Taliaferro, Jr.,* for plaintiff in
error.  (*C. M. Watts,* of Counsel.)

There can be no doubt but that, under the law, the agree-
ment entered into by defendants in error, with others, con-
stituted a mining partnership.  (Crawshay v. Maule, 1
Swanst., 495; Fereday v. Wightwick, 1 Russ. & M., 45;
Williams v. Attenborough, 1 Turn. & R., 70; Dickenson
v. Valpy, 10 B. & C., 128; Colly, Partnerships, Secs. 801,
808; 1 Bates, Partnership, Secs. 163, 374; Charles v.
Eshleman, 5 Colo., 107; Manville v. Parks, 7 Colo., 128;
Skillman v. Lachman, 23 Cal., 199; Duryea v. Burt, 28
Cal., 569; Kahn v. Smelting Co., 102 U. S., 641; Bissell v.
Foss, 114 U. S., 252, 260; Rockwell on Mines, 574; La-
mar v. Hale, 79 Vt., 147; Boucher v. Mulverhill, 1 Mont.,
306; Settembre v. Putnam, 30 Cal., 490; Lawrence v.
Robinson, 4 Colo., 567; Meagher v. Reed, 14 Colo., 335;
15 Enc. Law (1st Ed.), 609 et seq.; Armstrong v. Hig-
gins, 9 Colo., 38; Nolan v. Lovelock, 1 Mont., 224; Lyell
v. Sanbourne, 2 Mich., 102; Patrick v. Urston, 22 Colo.,
45; Congdon v. Olds, 18 Mont., 487; Abbott v. Smith,
3 Colo. App., 265.)  It seems that the mere constitution
of such a company, or mining partnership, is evidence of
an implied authority from one partner to another to pledge

his credit by borrowing money or purchasing necessaries
for carrying on the concern or business. The mere fact
of the organization of this company, and sending Young to
Alaska to prospect for them, was an implied authority to
Young to pledge the credit of each member of that part-
nership, for the purpose of purchasing supplies or borrow-
ing money necessary to the carrying on of the business of
prospecting.

The undisputed proof in this case shows that all the
money and supplies for which this action is brought was
used by Young, while carrying on the business for which
purpose the company was organized, viz.: prospecting for
gold. It makes no difference as to what agreements the
different partners had between themselves as to what
their liability would be. The plaintiff in error had no no-
tice of these agreements and under all the authorities can-
not be bound by them. (Nolan v. Lovelock, 1 Mont.,
225.)

When the trial court permitted the witnesses, Park and
Keenan, to testify that they had never authorized Young
to purchase supplies or borrow money on the credit of the
company or themselves, it committed error.

As to the court's refusal to allow the witness Young to
testify as to the contents of the letter written by Gosling,
authorizing him to borrow money, and also to answer the
questions as to statements made to Hartney by him, we
have, as we think, conclusively shown that each member
of the partnership had implied authority to bind the oth-
ers for the purpose of borrowing money or purchase of
supplies necessary for the conduct of the business, and the
contents of this letter being for that purpose (and Young's
statements to Hartney as to his authority to bind the com-
pany) it was clearly admissible, and in all events was ad-
missible as binding the defendant in error Gosling him-
self.

Nor can it be urged that there is a variance between the
allegations of a co-partnership debt and the proof of an

individual debt when looking at the matter from this point of view, for our statutes provide that "judgment may be given * * * against one or more several defendants * * * ." (Rev. Stat., Sec. 3752; Whittaker's Ohio Annotated Code, Sec. 5311, and cases cited.)

Where several persons are sued as partners and part only prove to be liable or authorized the contract, or found to be partners, it is now nearly everywhere the rule that in actions on contract, as well as in tort, judgment may be rendered against them, and for the others. (Bates on Part., Sec. 1094; 10 Ohio St., 451; Morgan v. Righetti, 45 Pac., 260; 11 Enc. Pl. & Pr., 853; 15 id., 960; Bliss' Code Pl., Sec. 74.)

No brief for defendant in error.

POTTER, CHIEF JUSTICE.

The plaintiff in error, Thomas Hartney, brought suit against C. H. Gosling, Dennis D. Waters, John Hartney, H. H. Edgar, John Park, and George L. Young, alleging that said defendants composed a partnership, and that at their special instance and request, on or about February 25, 1899, he loaned the defendants the sum of five hundred dollars, which they promised to repay to him, that no part of the said sum has been paid by defendants or either of them and that there is due to plaintiff from the defendants and each of them upon said account the said sum with interest. A statement of an account is attached to the petition, and referred to therein, containing one item only, viz.: "February 25, 1899. To money loaned and advanced, $500."

Of the defendants named in the petition, three only, Gosling, Keenan and Park, appeared and answered. Their answer was a general denial. The case was tried to the court without a jury upon the issue thus framed and the finding was general in favor of the answering defendants, and the judgment was that plaintiff take nothing, and that the said defendants have and recover their costs from the plaintiff.

A motion for new trial was overruled, and plaintiff prosecutes error.

The errors alleged in the petition in error are that the court erred in overruling the motion for new trial and in redering judgment in favor of the defendants for costs. The grounds for new trial contained in the motion are that the decision of the court is contrary to law, and not sustained by sufficient evidence; and that said decision is contrary to both law and the evidence; and that the court erred in excluding certain evidence therein set out offered by plaintiff, and admitting in evidence certain testimony therein also set out offered on the part of the defendants. These matters of evidence in respect to which it is charged that error was committed will be pointed out more specifically as we proceed.

The dealings out of which this suit arose occurred in Alaska between the plaintiff and George L. Young. The plaintiff provided Young with some money and provisions, and it is claimed that the circumstances were such as to place the defendants, as members of a mining partnership, under a legal obligation to reimburse the plaintiff therefor.

Prior to the departure of Young for Alaska, a written agreement was entered into between him and the other defendants. That instrument having been lost, evidence was introduced to show its contents. Young, Keenan and Park were each examined in relation to the agreement, and there is but little practical conflict in their testimony. Young was to proceed to Alaska and prospect for gold, and anything found by him was to be owned by the defendants in the following proportions: Young was to own three-tenths, Gosling two-tenths and each of the others one-tenth. He was furnished with seven hundred dollars by the other defendants, each one paying one hundred dollars, except Gosling, who paid two hundred dollars. In addition thereto they agreed to furnish to the family of Young, for their support during his absence, the sum of fourteen dollars per month, and the agreement in that respect was complied with.

Young testified that if he found a mine containing gold he was to develop the mine and dig out the gold. He did not state in so many words that the agreement contained a provision to that effect, but when asked what he was to do if he found gold, he replied that he was to dig it out; and he gave an affirmative answer to the question, inquiring if he was to develop the claim. It is doubtless to be understood from his testimony that he construed the agreement as requiring him not only to prospect for a mine, but if one was found to develop and work it for the joint benefit of all the parties. Nevertheless, that may have been merely his construction of an agreement that he should go to the country mentioned and prospect for the joint advantage of himself and those furnishing the money. Mr. Keenan testified that there was nothing in the agreement about developing and working a mine, if one should be discovered.

On his examination in chief, Young gave his recollection of the agreement as follows: "As far as I understood the contents of the agreement was, they furnished me with money, and they was to pay my family while I was away fourteen dollars per month, and if I found anything they were to each have one share, and I was to have three shares of whatever I might find." On cross-examination, he assented to the following statement of the written contract: "That in consideration of seven hundred dollars furnished to you, and the further consideration of fourteen dollars a month to be furnished to your family for one year, that you agreed to go into Alaska and prospect for gold, and if properties were found, that you was to receive three-tenths and each of the others one-tenth?" He was then asked if the seven hundred dollars was not all the other parties agreed to furnish outside of the monthly payment to his family, and he replied: "That is all that I understood." It elsewhere appears that as Mr. Gosling paid in two hundred dollars, he was to be entitled to two shares.

Mr. Park's version of the agreement was that Mr. Young was to go to Alaska to prospect, and if anything was found

he was to have three-tenths, Gosling two-tenths, and the witness one-tenth. Mr. Keenan stated the contents of the agreement to be "about as follows:" "Mr. Gosling put up two hundred dollars. The balance of those named put up one hundred each, which made seven hundred dollars. George Young was to have three-tenths of whatever was found and Mr. Gosling two-tenths, and those that put up one hundred each one-tenth. We were to pay a certain amount for the support of his family. The exact amount I don't remember, but I know I paid it."

The agreement seems to have been made in July, 1897, at Rock Springs, in this State, and Young arrived in Alaska sometime in that year. Just when he arrived is not shown, but from incidental references in the testimony it is probable that he proceeded to that country very shortly after the date of his agreement. He states that while there he located a claim and sunk two shafts in it, from twenty-four to thirty feet, but he found nothing in them, and seeing that it was a failure, he left it. He says it took from six to twelve months to do the work, but it is not clear whether he intended to state that the sinking of each shaft or both shafts occupied that much time, and it is probably immaterial. From a consideration of all the testimony, it is quite impossible to understand at what particular time during his stay in Alaska the above mentioned work was done. Had the evidence on that matter been more definite it might have simplified the question. He met Hartney, the plaintiff, who had preceded him to Alaska, in February of the following year, 1898, and it is reasonably clear that during some of the period succeeding their meeting they were engaged in prospectng and in traveling for that purpose; and hence after February, 1898, Young was not engaged solely in the work referred to upon the claim which he located and afterwards abandoned. He does not state, in regard to that claim, that it was located in the names of the defendants, nor does he or any witness give any information as to whose names were used in locating it. It may be assumed, however, that he held the claim for all the parties.

What disposition was made of the seven hundred dollars furnished him is not shown, and it does not appear that he did any other work than that above stated, except that in 1898 he made a prospecting trip, in company with Hartney and two others. We understand the testimony of the plaintiff and Young to show that in February, when Young "came down the creek," the plaintiff advanced him eighteen dollars, and in March he let him have one hundred dollars, with which sum of money Young bought provisions for his own consumption, and the money was furnished for that particular purpose. The plaintiff states that Young was not working and had nothing to eat, and that he loaned him the one hundred dollars to buy provisions with; that he had to go to Dawson, twenty miles below, to buy the provisions, and they lasted him until the plaintiff got through with the cleanup, where he had been working. He states that he then intended remaining another winter, and Young also wanted to remain, and he bought the latter provisions for the balance of the five hundred dollars sued for. He says that the provisions bought for Young, after the loan of the one hundred and eighteen dollars, were bought on the strength of a letter which Young had received from Gosling, one of the defendants. Young had told him about the "company business," and the parties who were interested with him, and the amounts they had respectively furnished him, and also showed him a letter he had received from Gosling. That letter, however, he had not seen, and he knew nothing about it, if, indeed, it had then been received, when the one hundred and eighteen dollars was advanced.

Before considering the Gosling letter it may be well to refer to some other matters tending to shed some light upon the situation of the parties in connection with the purchase of the provisions in question. It seems reasonably clear that after their purchase, which occurred in July, 1898, the plaintiff and Young remained together, sharing the provisions until February, 1899, when the parties had a settlement, and Young is said to have given a receipt to the plaintiff for five

hundred dollars, including the one hundred and eighteen dollars. It is to be understood, we think, that of the provisions which had been bought by plaintiff, and shared with Young, the proper proportion chargeable to the latter was agreed upon between them as three hundred and eighty-two (382) dollars. The receipt was lost, and was not, therefore, in evidence, nor was any testimony offered as to its contents or signature, other than the fact that it was given for five hundred dollars. There does not appear to have been any separation or division of the supplies at any time after their purchase. Plaintiff bought them, and permitted Young to live wth him and share them in common with him. No itemized statement was ever made, nor is there any other proof of what was in fact Young's reasonable share of the expense, except the statement of the plaintiff and Young that the amount agreed upon at the settlement was right.

After the purchase of the provisions the plaintiff and Young, with two others, went on a prospecting trip, and it seems from the testimony that during that trip these provisions constituted at least a portion of their means of subsistence. Indeed, nothing is said about any other provisions, and the court is left in the dark as to whether the other parties provided anything or not. On that trip also some of the provisions were lost by the upsetting of a boat. After that Young says that a horse was bought and "other things" to proceed on the trip, and conveys the impression that a part of the expense subsequently entering into the February settlement included the horse and "other things," although no explanation was offered concerning the later disposition of the horse, if any, or what the "other things" embraced.

Young testifies that if anything had been discovered on that trip each of the parties who were with him would have been entitled to a one-fourth interest; and that the defendants here would have had their proportionate share of his one-fourth interest. It is not shown that either of the defendants knew anything about that trip. Before concluding this statement of the situation, and of the acts of Young

while in Alaska, it should be added that the testimony fails to specially disclose what the agreement or understanding was, if any, between Young and the plaintiff at the time of the purchase of the provisions in the summer of 1898. Plaintiff testifies that Young and himself went together and bought their "outfit," and that he paid the bill, and kept an account of what they eat together, and in February following the amount owing by Young was agreed upon between them. The account, however, like every other writing concerned in the case, was lost.

It seems that Young received a letter from C. H. Gosling, one of the defendants. That letter he handed to the plaintff, and it could not be found. The plaintiff offered to prove by the witness Young that at or about and prior to the time of receiving the money sued for he received from Gosling a letter in which the latter authorized and told him, on behalf of the partnership, to borrow money and supplies from the plaintiff, and that he would see that it was paid, and that the partnership would also stand ready and willing to pay the same. In the offer it was stated that the letter was not in the possession of witness, but had been given to the plaintiff. The plaintiff had not then been examined as to its loss while in his possession. An objection to the offer was sustained. Later on the plaintiff testified that he lost the letter, and he stated that in the letter Young was told to borrow money from all he could, and plaintiff's name was mentioned in it, and to stay another winter and prospect, and that the company would be responsible, and that he, the plaintiff, would get his money back. At the conclusion of plaintiff's examination as a witness his counsel again offered to prove by the testimony of the witness Young, "as to the contents of the letter received by him from C. H. Gosling, that it stated for him to borrow money and supplies of Thomas Hartney, and that the company and himself would stand personally responsible, or words to that effect." The offer was denied.

We deem the above reference to the facts sufficient to permit an intelligible consideration of the legal propositions in

the case, although it may become necessary to allude to some particular statements found in the testimony not already mentioned.

It is urged that the judgment is contrary to the law and evidence as between the plaintiff and all the answering defendants, and especially as against Gosling. In this controversy the only right of the plaintiff to be considered is his right to recover from Gosling, Park and Keenan, or either of them, upon the issues made by the pleadings and upon which the action was tried.

To sustain the charge of error in the judgment, counsel for plaintiff contends in the first place that the agreement between Young and the defendants constituted a mining partnership, and that they became mining partners; and it is urged that Young had implied authority, by reason of the fact of partnership, to pledge the credit of all the defendants, as his partners, by borrowing money or purchasing necessaries for carrying on the concern or business.

It is generally and, we think, universally held that in a mining partnership, pure and simple, one partner has no implied authority to borrow money on the credit of the firm. (Barringer & Adams on Mines & Mining, 752; 2 Lindley on Mines, Sec. 801; Skillman v. Lachman, 23 Cal., 199.) But what is a mining partnership? The definition given by Mr. Lindley is: "Where several owners unite and co-operate in working a mine." (2 Lindley, Sec. 796.) And that definition is also given by Barringer & Adams, p. 750.

Parties may be tenants in common of a mining property without constituting a mining partnership. The partnership is constituted when, as such tenants in common or co-owners, they unite and co-operate in operating or working the mine. (Nolan v. Lovelock, 1 Mont., 224; Congdon v. Olds (Mont.), 46 Pac., 261; Skillman v. Lachman, 23 Cal., 199; Charles v. Eschelman, 5 Colo., 106; Prince v. Lamb (Cal.), 60 Pac., 689; Lyman v. Schwartz (Colo.), 57 Pac., 735; Manville v. Parks, 7 Colo., 128.) It is indicated in the case last cited that as a condition to the existence of a mining

partnership it is not necessary that the mine be owned by the parties working it, for it is said to be evident that such a partnership may exist as well where the parties have an interest merely in the working of a mine, or in carrying on mining operations, as where they own the mine itself. In the cases which have come under our observation the partnership has been held to exist only where there has been co-operation in working or developing mining property. A mining partnership is distinguished from an ordinary partnership by the absence of the *delectus personarum* which characterizes the latter. In mining partnerships neither death nor bankruptcy of one of the members will dissolve it, nor will a dissolution be worked by the sale of an interest by one of the partners. This principle is largely responsible for the greater limitation upon the implied powers of a partner in a concern of that kind.

The implied powers of a partner in a mining partnership, as to third persons, is not held to go further, we think, than authority to bind his co-partners by dealings on credit for the purpose of working the mine, where it appears to be necessary or usual in the management and course of the business. In the case of Manville v. Parks, *supra,* the other partners were held liable for a debt contracted by the managing partner, where it was shown that the articles purchased were essential to the carrying on of the business and the accomplishment of the purpose of the defendants in working the mine.

A mining partnership may not only be created by express contract of the parties, but its existence may be deduced from the acts of the parties. (Skillman v. Lachman, *supra.*) In that case it was said that "in the case of an ordinary mining partnership, something more will be required to raise the presumption of liability arising from persons holding themselves out to the world as partners than would be necessary in the case of an ordinary partnership. Such persons, in the absence of other circumstances, cannot fairly be presumed to have intended to render themselves liable to all the

consequences of a commercial partnership." In that case the authorities bearing upon the subject are reviewed and the whole subject learnedly discussed.

In the case before us it is not perceived how the trial court, from the mere acts of the parties, could have found a mining partnership to have existed, so as to confer upon Young implied power to bind the defendants by contracting the debt sued on. The failure of the proof to fix the period when Young was employing his time in sinking the two shafts upon the claim located by him has already been alluded to. It is true that Young stated the money furnished by Hartney was spent for provisions, &c., before they started out to work the claim, and he responded "Yes" to the question in substance whether the money was expended while he was working the claims, and preparing to work them, in which all the defendants had an interest. And this question was asked Mr. Hartney: "Was he prospecting after he got these supplies and during the time he got them on the claim he got for the company and had been located by him?" And he answered, "Yes, sir." The witness had immediately before stated that Young used the supplies to keep body and soul together while he was prospecting for the company out there. Yet it appears that the provisions were not obtained through the bounty of Hartney until the summer of 1898, after Young had been in the country nearly a year; and after they were obtained he was on a prospecting trip with Hartney and others; and it is apparent that while on that trip he could not have been working on the claim which he testified to having located and abandoned.

We cannot attach to the affirmative responses to the leading questions above mentioned sufficient importance to outweigh all the other facts and inferences to be legitimately derived from the rest of the testimony. The plaintiff had the burden of proof. These defendants, at least Keenan and Park, had not held themselves out as partners of Young; and the evidence fails to satisfy us that Hartney was led into parting with his money by reason of the working of a

mine owned by the defendants in common with Young. If he based his right upon the fact that the defendants were joint owners of a mine, and that they were united and had co-operated in working it, he should have shown that fact. To say the least, the evidence upon that matter is so indefinite and uncertain that it furnshes no ground for reversing the judgment of the court.

Even if there was an agreement providing that Young should work a mine when discovered, we think it quite impossible to hold that the court erred in not finding that a mine had not only been discovered, but was being worked by Young in co-operation with defendants, and that the money and provisions provided by the plaintiff were obtained for the purpose of working the mine, and as essential to its proper management in the usual course of business.

But Keenan testified that the agreement contained no provison respecting the work or development to be done upon a mine, should one be discovered; and in stating the contents of the lost instrument no witness mentioned a provision of that character. Young, it is true, replied affirmatively when he was asked if he was to develop a mine if he found one; and he said that if he found gold he was to dig it out. That may have been, and we are inclined to think it was, merely his interpretation of his duty under the contract. At any rate, the evidence would not authorize an appellate court to reverse the trial court, and hold that the agreement was one for the joint working of a mine, after its discovery and location. There was no evidence of an agreement other than the one reduced to writing. Both Keenan and Park testified that they had not authorized Young to borrow money or to contract debts in their name or for the company.

If any liability rests upon the defendants as mining partners to pay the claim of the plaintiff, it must arise in consequence of the agreement entered into between them and Young. In view of the evidence, we are of the opinion that the learned District Court would have been justified in holding that the contract did not by its terms contemplate the

subsequent working of a mine by Young. The contract seems to have approached more nearly a prospecting or "grub stake" contract than a mining partnership. A prospecting contract is said to partake of the character of a qualified partnership, although Mr. Lindley in his valuable work regards the term "partnership" to be a misnomer as applied to the ordinary "grub stake" contract. (2 Lindley on Mines, Sec. 858.) That author describes such a contract in its usual scope to be simply a common venture, wherein one·party, called the outfitter, supplies the "grub," and the other, called the prospector, performs the labor, and all discoveries inure to the benefit of the parties in the proportion fixed by the agreement. (Id.) We entertain no doubt but that such a contract may go further and so provide relative to the duties and rights of the parties thereunder as to constitute a partnership. Or it may so provide as to render the outfitter liable for the personal expenses of the prospector after the exhaustion of the money furnished at the outset. The liability, it would seem, must depend upon the contract which the parties have made, the same as in any other case.

The agreement in this case definitely fixed the amount of money to be furnished to the prospector. The parties did not contract to supply him indefinitely with provisions and supplies, nor, indeed, did they, in terms, agree to furnish those things. Doubtless, it was understood that the money supplied to Young would be employed by him in paying his necessary traveling expenses and in securing the supplies, such as provisions and tools, to enable a performance on his part of the agreement. But the agreement was not to provide him with necessaries while he furnished his services. The defendants paid him a certain sum of money and agreed, during his absence, whether for one year or longer is immaterial, to furnish his family with a monthly allowance for their maintenance; and, in addition thereto, he was to receive an interest in any property discovered by him. The prospector himself states that the seven hundred dol-

lars was all that he understood the other parties to the contract were to pay.

It is evident that, by virtue alone of the agreement, he could have had no legal recourse upon them for more money to pay his personal expenses. We are unable to see how the contract can be extended by judicial construction to cover additional liability on the part of those furnishing the money portion of the capital for the common enterprise. To do so would, in effect, be equivalent to holding that when one has merely agreed to provide and does provide a definite sum of money to another, to use in prospecting for mineral, by that act alone he becomes bound for all expenses incurred by that other for personal supplies after, or even before, the sum originally furnished has been exhausted. We do not think that is the law. We have not been cited to any case announcing such a doctrine, and we are aware of no principle in the law that would authorize it. This is not a case, at least as to Keenan and Park, of persons holding themselves out to the world as partners. Young told the plaintiff that the defendants had furnished him certain sums of money. He did not inform him that they had agreed to furnish more or to be responsible for more, except to show him the letter of Gosling, which will be noticed later on. And it would not have bound those not assenting to it, if he had so represented the agreement. Keenan testified that he did not expect Young to remain in Alaska after the money supplied him had been spent. Of course, the individual understanding of the witness could not have changed the provisions of the contract; but we think it did not have that effect. The contract was not shown to contain anything authorizing the prospector to continue at the further expense of the other parties, after exhausting the money received by him.

We think, therefore, that the character and provisions of the agreement were not such as to impose the alleged liability upon the defendants. There was no error in permitting the defendants Keenan and Park to state that they had not authorized Young to borrow money or contract debts

on their indivdual behalf or on behalf of the company or association. It was not permitting partners to testify as to agreements between themselves limiting their liability. Not being otherwise responsible, they were allowed to testify that they had not specially authorized the contracting of the debt. The cases cited to show that partners cannot evade liability for debt contracted by one member of the firm, by proof of an express agreement denying his power to incur debts without consent of the others, unless the creditor had notice of the agreement, are not applicable.

Finally, it is contended that the court erred in excluding the offer to prove by the witness Young that the letter he received from the defendant, Gosling, directed him to borrow money and supplies from the plaintiff, and that he and the company would be responsible for the amount. And, in view of the testimony of the plaintiff stating some of the contents of the letter, that the judgment should have gone against Gosling, if not all of the defendants.

The plaintiff stated that in the letter Young was directed to borrow money and stay another winter and prospect, and that the company would be responsible, and the plaintiff would get his money back. If admissible at all, it does not necessarily follow from the fact that the above was brought out in the testimony of Hartney, that the exclusion of the offered testimony was harmless, for the reason that the offer was not confined to proof of promised liability on the part of the company, but embraced a statement that the writer of the letter would be also "personally" responsible.

As the offer did not go to the extent of tendering proof that Keenan and Park knew of the letter, or that they had authorized it, or assented to it, it could not have affected them, and, strictly speaking, as against them the letter would not have been admissible, and as to them, therefore, no error was committed in rejecting the offer. Gosling possessed no more power than Young to bind the other parties.

But under our statute judgment may be given for or against one or more of several defendants. (Rev. Stat., Sec.

3752.) Under such a statute it is well settled that where several persons are sued as partners and part only prove to be liable or to have authorized the contract, or are found to be partners, judgment may be rendered against them and for the others; and this is the rule in actions on contract as well as in tort. In actions on contract the statute changes the common law rule. (Bates on Partnership, Sec. 1094; Roggencamp v. Hargreaves, 39 Neb., 540; Lampkin v. Chisom, 10 O. St., 450; Morgan v. Righetti (Cal.), 45 Pac., 260; 11 Ency. Pl. & Pr., 853; 15 id., 960. See also Rainsford v. Massengale et al., 5 Wyo., 1; Fisher v. Hopkins, 4 Wyo., 379.)

Hence, the question arises whether the evidence offered was admissible as against Gosling as tending to show his liability for the claim sued on, or any part of it. The loss of the letter was established, and if it would have been competent and relevant to the issue, evidence to prove its contents would have been equally proper.

It is clear that it would not have been material as to the one hundred and eighteen dollars advanced in February and March, 1898, for the reason that at that time the plaintiff had not seen the letter; and, therefore, did not part with his money in reliance upon it. But he testified that he bought the provisions for Young in the summer on the strength of the letter. As to the debt then incurred by Young, we are of the opinion that the evidence offered was competent and relevant as tending to show that Gosling had as to the plaintiff held himself out as a partner of Young, and authorized him to borrow money from the plaintiff. Indeed, the testimony of the plaintiff that went in without objection, purporting to give the contents of the letter, had the same tendency. But from the exclusion of the same character of testimony, when twice offered, it is evident that the trial court did not regard the matter as material, and it is evident also, we think, that counsel on both sides so understood the mind of the court and did not, therefore, further pursue the theory of individual responsibility on the part of

Gosling. · We are not advised by the record whether Gosling was or was not present at the trial. · But if he was, it may reasonably be assumed that if he could have given an explanation of the letter favorable to himself, it was not deemed necessary for him to do so, in view of the very plain indication that the court would entirely disregard· the testimony of the plaintiff concerning the letter.

We do not conceive it incumbent on us to hold that the testimony as it stood was sufficient to charge Gosling before we should disturb the judgment as to him, because it is apparent to our mind that the case was decided without any reference to the letter as bearing upon the personal liability of the writer thereof, and that it was treated as though not in the case. For that reason also it seems to us that the exclusion of the offered testimony cannot be said to have been harmless as merely cumulative.

The testimony offered on the subject of the letter should have been admitted, and in view of the situation above stated, according to our understanding from the disclosures of the record, its exclusion amounted to prejudicial error. To show that the defendant Gosling had so acted as to entitle plaintiff to believe him to be a partner with Young, and as such to have authorized the latter to borrow money from the plaintiff would not be fatally variant from the allegation of partnership in the petition. (Cornhauser & Co. v. Roberts et al., 75 Wis., 554; Reber v. Columbus M. & M. Co., 12 Ohio State, 175; Hancock v. Hintrager et al., 60 Ia., 374.) In Cornhauser v. Roberts, *supra,* it being contended by counsel that where one is sought to be charged as a partner on the ground that he has held himself out as such, and so induced credit to another as a co-partner, the complaint must set out the facts essential to charge the one who is not in fact a partner, but has by his act misled the creditor, and that recovery cannot in such case be had upon a general allegation of partnership, it was said by the Wisconsin court: "We think this contention of the learned counsel for the defendants is not sustained by principle or authority. The complaint alleges

that the defendants are indebted to plaintiff as partners for goods sold and delivered to them as partners. The defendants, by their answer, deny the partnership. It becomes necessary, therefore, for the plaintiff to prove the partnership in order to maintain its action. This it may do by direct proof of the partnership, by the admissions of the several defendants that they were at the time partners, or by other acts which show that they were holding themselves out as partners." And, further, it is said that "the mere fact that the evidence is also evidence upon which an estoppel *in pais* might be based is no objection to the evidence as admissible to prove the alleged partnership." (See also Rainsford v. Massengale et al., 5 Wyo., 1.) In the case cited from Iowa it was said: "Appellant was sued as a partner, and any evidence which tended to show that he was liable to the plaintiff as a partner was competent. It was neither proper nor permissible to plead evidence."

Should the effect of the evidence be to establish a guaranty for a debt to be incurred by Young, rather than a holding out as partner, we incline to the opinion that it would constitute a total failure of proof. (Packard v. Snell, 35 Ia., 80.) Upon that theory the letter would not be admissible or relevant. But, in connection with the previous agreement, we think, upon a careful scrutiny of the offer as made, its tendency was to show that the direction to borrow money was made to Young upon the theory of a partnership. What would be developed upon its admission and subsequent explanation by the defendant, we cannot know.

From objections made on the trial, it seems that counsel for defendants took the view that the transaction in the summer of 1898 did not amount to a loan of money; but that, as provisions were furnished to Young in the manner hereinbefore stated, there could be no recovery therefor under the petition alleging an indebtedness for money loaned. That might depend altogether upon the arrangement between plaintiff and Young. It may be that plaintiff agreed to provide Young's share of the money necessary to buy the re-

quired supplies, the amount thereof to be subsequently determined upon between them; and that the matter was treated and considered strictly as a loan of money, although the money itself was handed over to the proprietor of the store where the goods were purchased instead of to Young. We are not prepared to say that the facts are not susceptible of that interpretation. The receipt given when the parties separated was for money. Plaintiff states that both of them bought the goods, although he furnished the money. Mr. Keenan testified that upon the plaintiff's return the latter said to the witness that he gave Young five hundred dollars "for you fellows up there."

As the case must be remanded as to Gosling for the manifest error in excluding the offered testimony, and there must be a new trial, we do not care to express a decided opinion as to his liability upon the testimony before us; and hence we do not wish to be understod as holding that the facts at the former trial established a case of a loan of money to Young. Upon the facts brought out at that trial, we think the question may be regarded perhaps as a close one. Neither have we considered whether, if the plaintiff's case is other than that for money loaned, it is such an one as would authorize an amendment to the petition, nor have we gone into the question of the effect, if any, upon Gosling's liability of the arrangement between Hartney, Young and their two companions on the prospecting trip for a joint interest in their discoveries.

For the error in excluding the testimony concerning the letter of Gosling, the judgment as between him and the plaintiff must be reversed, and the case as between them remanded for a new trial. There is no error in the record as to the defendants Keenan and Park. The judgment in their favor will be affirmed.

Corn, J., and Knight, J., concur.