## No. 8644.

### JAMES *v.* JAMES.

1. WILLS—*Contest—Incapacity—Undue Influence.*  Testimony held sufficient to warrant the findings that the testator was mentally incapable, and acted under undue influence of the devisee.
2. EVIDENCE—*Witness—Competency.*  Will Contest.  Under Rev. Stat. sec. 7267, brothers of the testator were held properly admitted to deny statements made by the testator touching alleged troubles and controversies with them, the statements having been made in the presence of the proponent of the will, and the principal beneficiary thereunder.
3.—— *Letters—Constituting but a Part of a Correspondence,* are not admissible in evidence.

*Error to Rio Blanco District Court, Hon. John T. Shumate, Judge.*

Mr. DYSON S. DINES, Mr. ORVILLE L. DINES, Mr. PETER R. HOLME and Mr. GEORGE A. PUGHE, for plaintiff in error.

Mr. JOHN T. BOTTOM, for defendants in error.

Mr. Justice Scott delivered the opinion of the court.

THIS is a proceeding in contest of the will of Thomas E. James, who died on the 10th day of May, 1913, and who executed the instrument on the 27th day of February preceding.

The estate is estimated to be of the value of one hundred thousand dollars.  The deceased was a bachelor, and his heirs were Walter James, residing at Rifle, Colorado, and to whom was bequeathed $1,000; Edgar James of Chicago, not mentioned in the will, and Levina Stevens, a sister, residing at Kansas City, Missouri, to whom was bequeathed $350 each year for a period of fourteen years, all of whom are the protestants; also William H. James, proponent and residuary legatee under the will.  These are the brothers and sister of the testator.  The grounds of the protest are mental incapacity, and also undue influence upon the part of William H. James, his wife and family.

The protest was sustained in all respects by the court and jury, and judgment rendered accordingly.

It appears that the testator, with his brother, William, settled in what is now Moffat county, about twenty-five years before the testator's death; that within a few years William removed to Chicago and entered the coal business, apparently leaving no property interests in Colorado; that about the same time Walter, then a boy, or perhaps a young man, came to Colorado, and lived and worked with the testator for many years, and until within a very few years before the latter's death. Thomas and Walter were together engaged in the ranch and cattle business. Walter later sold his interests to Thomas, and removed to the locality of Rifle, Colorado. Some time after this, and during the year 1911, testator visited his brother William in Chicago, and in the same year William sold his coal business to the brother Edgar, and with his wife and family came to the ranches of testator, and continued to reside there until testator's death. From the time of his removal to the ranch of Thomas, William took the responsible charge of testator's affairs, the latter living with William and his family.

The testimony shows that about ten or more years before his death, the testator became afflicted with epilepsy; that these attacks increased in frequency and severity; that for more than two years prior to his death the attacks occurred as frequently as once in two weeks, and with great severity, requiring several days in certain instances for recovery, and that he finally died in one of these attacks. There does not appear but two business transactions upon the part of testator after the time proponent and his family came to live with him and manage the ranch. He kept no account at his local bank and paid no bills thereafter. The first of these transactions was the execution of a deed in March, 1912, conveying his ranch lands to the proponent, reserving a life estate therein. The other was the execution of the will in question, and a bill of sale of his personal property to the proponent at the same time. Neither the deeds nor the bill of sale are in evidence.

The will purports to ratify the deed in the following paragraph:

"First: Heretofore I have made, executed and delivered to my brother, William H. James, now a resident of Moffat county, Colorado, a certain deed, by which I conveyed, or intend to convey, all my right title and interest in the James Brothers' Ranches, situate in Moffat and Rio Blanco counties, Colorado, and in all real estate and water rights standing in my name, or of which I was the owner subject to a life interest therein reserved by me in and by said deed. I hereby confirm said deed, and direct that on my death my life interest in the property in said James Brothers' Ranches, and all my other interest therein, shall vest in my brother, William H. James, if living; if not, in his heirs at law; and if for any reason said deed shall be defective in form or insufficient to convey said property therein described, or any part thereof, or any part of the James Brothers' Ranches, I hereby give, devise and bequeath to my said brother, William H. James, all my right, title and interest in and to said the James Brothers' Ranches, together with all water rights, ditches, flumes, conduits, reservoirs and other rights of a similar nature appurtenant to said land, or of which I may die seized."

The will was made under circumstances substantially as follows:

William, the proponent, his wife and the testator, came to Denver from the ranches on January 1st, 1913, and remained at a hotel until February 7th. They were absent from the 7th to the 17th of February, spending this time at Fort Collins, when they returned to the hotel, and remained until March 4th. Speaking of the testator, the hotel clerk, testifying on behalf of proponent, said, "I never saw him go away by himself. They were all together. Just one family."

It appears that William James took the testator to the office of his own attorney on the 18th or 19th day of February, introduced him, and told the attorney that the testator

wanted him to draw a bill of sale and a will. The attorney seemed to hesitate, because of his professional relationship with William, and the matter was deferred until the following day, when the two brothers returned to the law office, and the bill of sale and will were drawn. The testator took the will with him, and with William returned in about a week, and with the will slightly changed, and when it was executed.

Speaking of the appearance of the testator during these visits to his office, the attorney testified that he was very fragile; that as a reason for his conclusion that the will should be executed while testator was in Denver, he assumed he was dealing with an epileptic who was in a bad state of health, and felt that they absolutely knew his condition at that moment, and that his will could be then executed with less ground for an attack on it.

The attorney testifies that when the brothers returned after about a week's absence, he expressed surprise, supposing that they had returned to the ranch, but that William took him to one side and said that testator had not been well, "You know he is in pretty bad shape, been lying down or in bed, or something of the sort, and said such things as led me to believe that he had suffered an attack," though the witness had since learned otherwise.

The parties left Denver for the ranch on March 4th, and the testator died on May 10th.

The testimony in the case, medical and otherwise, is very voluminous, and, while conflicting, is amply sufficient to justify the jury in finding that the testator was incapacitated mentally to make the will, and likewise to support the allegation of undue influence, therefore the verdict and judgment will not be disturbed upon the ground of insufficiency of the testimony to support the verdict.

Error is assigned as to certain instructions of the court. We have examined these and are of the opinion that there is no reversible error in this respect. The law applicable

to the issues involved here is quite fully discussed in the case of *Davis v. Davis,* decided at this term of court, and in the authorities therein cited, and it can serve no useful purpose to repeat the discussion.

Mr. Dines, who drew and witnessed the will, and who is the attorney for proponent in this case, testified that the testator told him during the period when the draft of the will was under consideration, in substance, that he had difficulty with his brother Walter, and that the brother Edgar had married a woman whom he very much disliked.

Presumably this testimony was offered as tending to furnish a reason for disinheritance. There was no other testimony even tending to show any estrangement between the testator and either of these two brothers. Both were permitted to testify in rebuttal of Dines' testimony, and it is very strenuously argued that the admission of the testimony constituted prejudicial error as being in violation of sec. 7267, Rev. Stat. 1908, and the case of *In Re Shafters Estate,* 35 Colo. 578, 85 Pac. 688, is cited. But since that case was decided and by the law of 1907, the statute was amended by the addition of the following exception:

"Sixth: In any such action, suit or proceeding, any adverse party or parties in interest may testify as to any conversation or admission, or as to all matters and things connected with the subject matter of said action, suit or proceeding, and which conversation and admission and matters and things aforesaid, occurred before the death and in the presence of such deceased person, and also in the presence of any member of the family of such deceased person over the age of sixteen years, or in the presence of any heir, legatee or devisee of such deceased person over the age of sixteen years. Provided, however, that such member of the family, heir, legatee or devisee, as the case may be, is present at the hearing of said action, suit or proceeding, or whose testimony is or may be procurable at such trial."

The court admitted this testimony expressly upon his

finding that the statements were made in the presence of William H. James, heir and devisee of the deceased.

The testimony of Walter James was in substance as follows:

"Q. You heard the testimony of Mr. Dines that Thomas E. James, your brother, had said to him that he had a fuss with you, or had some trouble with you? A. The statement was not true."

The testimony of Edgar James so objected to was in substance as follows:

"Q. Did you hear the testimony of Mr. Dines yesterday? A. I did.

Q. Did your brother, Thomas E. James, ever at any time or place, or in any manner or form, by word of mouth, letter or other communication, object to your marrying your wife? A. I have no recollection whatever of anything of the kind."

If this testimony is barred under the general rule, then it is brought within the exception. But it is difficult to see the materiality of the testimony of either Mr. Dines or the brothers.

It is contended that the court erred in refusing to admit certain letters identified as having been written by the deceased to Wm. H. James, and his wife, and others written by Edgar James, one to Thomas E. James, and one to James Brothers, These were identified by the wife of the proponent. It is patent that the letters were in reply to others, and form only a part or one side of the same correspondence in each case. The witness thought she could produce the letters to which those offered were in reply, and was given opportunity to do so and failed. The court then excluded the letters offered. It is a well settled rule of law that individual letters constituting a part of a general correspondence between parties as to a particular matter are inadmissable, unless the entire correspondence is offered. It does not appear that these letters are ma-

terial in any event and might well have been excluded for that reason alone.

The judgment is affirmed.

*En banc.*

White, C. J., and Garrigues, J., not participating.

Decided January 8, A. D. 1918.  Rehearing denied April 1, A. D., 1918.